Nathaniel DAVIS, Frederick D. Purdy, Ray E. Davis, Plaintiffs,

v.

Constantin COSTA–GAVRAS; Universal City Studios, Inc.; MCA, Inc.; and the Hearst Corporation, Defendants.

No. 83 Civ. 2539 (ADS).

United States District Court, S.D. New York.

Oct. 16, 1984.

Robert Kasanof and Bart M. Schwartz, New York City, for plaintiffs; Robert Kasanof, Bart M. Schwartz, Howard E. Heiss, New York City, of counsel.

Williams & Connolly, Washington, D.C., for defendants Universal City Studios, Inc., MCA, Inc., and Constantin Costa-Gavras; Irving Younger, David E. Kendall, Steven A. Steinbach, Washington, D.C., of counsel.

Baker & Hostetler, Washington, D.C., for defendant Hearst Corp.; Bruce W. Sanford, Washington, D.C., of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Plaintiffs filed this libel action in January 1983 in the Eastern District of Virginia. The suit was subsequently transferred to the Southern District of New York. *Davis v. Costa-Gavras*, No. 83–0019–A (E.D.Va. March 25, 1983). Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. Plaintiffs are two State Department officials, Nathaniel Davis and Frederick D. Purdy, and a naval officer, Captain Ray E. Davis, who were stationed in Santiago, Chile in September 1973 during the military coup which deposed the government of Salvador Allende Gossens. While stationed in Chile, Plaintiff Nathaniel Davis served as United States Ambassador, Frederick D. Purdy as United States Consul to the Santiago Consulate, and Captain Ray E. Davis as Commander of the United States Military Group and Chief of the United States Navy Mission to Chile.

Charles Horman was a United States citizen killed in the aftermath of the September 1973 coup. The circumstances surrounding the disappearance and death of Horman attracted the attention of the author Tom Hauser, who researched and wrote what purports to be a nonfiction account of Horman's death, entitled *The Execution of Charles Horman: An American Sacrifice* ("*Execution*"). Harcourt Brace Jovanovich, Inc., ("HBJ") published Hauser's work in hardcover in 1978. The book, republished in paperback by The Hearst Corporation ("Hearst"), was the basis for the motion picture "Missing," directed by Constantin Costa-Gavras and released by Universal City Studio's, Inc., ("Universal") a wholly owned subsidiary of MCA, Inc. ("MCA").

Plaintiffs named as defendants the author Hauser, publishers HBJ and Hearst, and filmmakers Costa-Gavras, Universal, and MCA; they claim that defendants, through publication of the books and release of the film, "falsely accused [them] of ordering or approving the order for the murder of Charles Horman." In an opinion and order dated February 7, 1984, motions for summary judgment by the defendants Hauser and HBJ were granted. *Davis v. Costa-Gavras*, 580 F.Supp. 1082 (S.D.N.Y. 1984).

Defendant Costa-Gavras now renews his motion to dismiss for lack of personal jurisdiction and also moves, together with Universal and MCA, for judgment on the pleadings on the ground that the movie "Missing" is not susceptible of a defamatory interpretation. Defendant Hearst moves for summary judgment on the ground that it is not liable either for the republication of the hardcover book *Execution*, or for any defamatory statements contained in the motion picture "Missing." For the reasons set forth below, defendant Costa-Gavras' motion to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2) is denied, and defendant Hearst's motion for summary judgment pursuant to Rule 56 is granted. The motions of defendants Costa-Gavras, Universal, and MCA to dismiss under Rule 12(c) will be assessed in a separate opinion and order.

### I. *Personal Jurisdiction*

Costa-Gavras argues that this court may not exercise jurisdiction over him consistent with either New York state's long-arm statute, NYCPLR § 302 (McKinney 1972), or the requirements of due process, *see International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90

L.Ed. 95 (1945); *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Plaintiffs claim that the jurisdictional issue was finally decided by Judge Cacheris when he transferred the case to this District, that Costa-Gavras waived his power to object to jurisdiction here by moving to transfer this case to the Southern District of New York, and that jurisdiction in any event exists under NYCPLR § 302(a)(1) and (a)(2).

Judge Cacheris entertained neither briefing nor argument as to the propriety of jurisdiction in New York, and never explicitly determined that the Southern District of New York would have personal jurisdiction over Costa-Gavras. The general rule that a disappointed litigant should not be given an opportunity to litigate a matter that has been fully considered by a court of coordinate jurisdiction, *see Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162 (3rd Cir.1982), is therefore inapplicable. *See Hoffman v. Blaski,* 363 U.S. 335, 340 n. 9, 80 S.Ct. 1084, 1088 n. 9, 4 L.Ed.2d 1254 (1960) ("order did not purport to determine the jurisdiction of the transferee court and therefore did not preclude [transferee court] of power to determine [its] own jurisdiction..."); *see also* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3827, at 175 (1976)'(transferee court has power to reexamine for itself whether it is a court in which suit could have been brought). Plaintiffs' further argument that Costa-Gavras waived jurisdiction by moving to transfer need not be decided, for *in personam* jurisdiction clearly exists.

Costa-Gavras, a citizen and resident of France, coauthored the screenplay for the movie "Missing," and directed the film. From August 1980 when he began working on the screenplay, until December 1980 when the screenplay was in final form, Costa-Gavras was in New York City on approximately seven or eight occasions. Costa-Gavras Affidavit at 2. During this period and at his request, *see* Costa-Gavras Depo. Tr. at 9, he met with Thomas Hauser, author of the book *Execution,* and asked Hauser questions "probably concerning the story and the characters and the information." *Id.* at 20. Costa-Gavras also met with Donald Stewart, coauthor of the screenplay, *see id.* at 8, and consulted with the family of Charles Horman. Costa-Gavras Affidavit at 2–3. In late 1981 and early 1982, Costa-Gavras returned to New York on at least three separate occasions. In September 1981, he was in New York to attend the screening of "Missing" for the family of Charles Horman, and in October 1981 he attended another New York screening of the film for executives of Universal. Costa-Gavras Affidavit at 3. In addition to these private screenings, Costa-Gavras also attended, in or about January 1982, the formal premiere of the film in New York. Costa-Gavras Depo. Tr. at 26–27. In December 1981 he traveled to New York and remained here for several days to engage in various publicity-related activities in connection with the release of the film, including consultations with publicity representatives regarding the material to be used in the advertising campaign for "Missing," and meetings with media representatives. Costa-Gavras Affidavit at 3. In addition to these extensive New York activities related to "Missing," Costa-Gavras also visited New York City approximately 20–25 times in the past 10 years "either in connection with motion picture productions or to visit friends," and he maintains a bank account here. *Id.* at 3–4.

NYCPLR § 302(a)(1) creates a two-step test for personal jurisdiction, requiring not only that the defendant "transact business" in the state, but also that the cause of action "arise" from the in-state transactions. *See Xedit Corp. v. Harvel Industries Corp., Fidelipac,* 456 F.Supp. 725, 728 (S.D.N.Y.1978); *Longines-Wittnauer,* 15 N.Y.2d 443, 452, 209 N.E.2d 68, 72, 261 N.Y.S.2d 8, 14, *cert. denied,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965); *Rene Boas & Assoc. v. Vernier,* 22 A.D.2d 561, 257 N.Y.S.2d 487 (1965). Defendant's numerous in-state activities, including business meetings with various persons connected with the writing, production, and release of the motion picture "Missing," constitute "transacting busi-

ness" within the meaning of the statute's threshhold requirement. *Cf. Xedit*, 456 F.Supp. at 728 (single meeting at trade show constitutes "transacting business" for purposes of § 302(a)(1)); *Potter's Photographic Applications Co. v. Ealing Corp.*, 292 F.Supp. 92, 101–02 (E.D.N.Y. 1968) (defendant was "transacting business within state" for jurisdictional purposes where preliminary contract negotiations were conducted in New York on at least three occasions).

Defendant's New York State activities were also purposeful and sufficiently proximate to the allegedly unlawful acts that the cause of action here may fairly be said to arise out of those activities. By coming to New York on approximately ten separate occasions to engage in meetings with Hauser, the Horman family, publicity and media representatives, and coauthor Stewart, Costa-Gavras " 'purposely' availed himself 'of the privilege of conducting activities' within New York and thereby 'invok[ed] the benefits and protections of its laws' [in connection with the motion picture "Missing"]" *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 18, 256 N.E.2d 506, 508–09, 308 N.Y.S.2d 337, 341 (1970) (quoting *Denckla*, 357 U.S. at 253, 78 S.Ct. at 1239). The cause of action "arises" from defendant's New York activities inasmuch as these activities substantially contributed to the writing of the screenplay and to its production, promotion, and release, and thereby necessarily furthered the alleged libel.

Furthermore, defendant's extensive, purposeful contacts with the state of New York are such that the maintenance of this suit can in no sense be said to offend "our traditional conception of fair play and substantial justice," *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160, and the exercise of jurisdiction here over Costa-Gavras will further both plaintiffs' "interest in obtaining convenient and effective relief, *see Kulko v. Superior Court*, 436 U.S. 84, 92 [98 S.Ct. 1690, 1696, 56 L.Ed.2d 132] (1978), ... [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies." *World-Wide*

*Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). Finally, New York State's interest in adjudicating this dispute is significant; as an important center for the film industry, New York has an interest in ensuring that the risks and liabilities flowing from filmmaking activities substantially undertaken in New York be uniform.

## II. *Republication*

Plaintiffs assert that Hearst is liable for republishing in paperback form allegedly defamatory material contained in *Execution*, and that Hearst shares responsibility with defendants Costa-Gavras, Universal and MCA for defamatory statements allegedly contained in the motion picture "Missing." Hearst, claiming that no material issues of fact are in dispute, moves for summary judgment on the grounds that: 1) its republication of the 1982 paperback edition is not actionable defamation as a matter of law; and 2) it bears no legal responsibility for any defamatory material allegedly contained in the motion picture "Missing."

### A. *The Paperback "Missing".*

■ *Execution* was first published in hardcover in 1978 by HBJ. In March 1979, a division of Hearst, Avon Books ("Avon"), acquired a license from HBJ to publish paperback editions of *Execution*. Pursuant to this agreement, Avon republished the book under the same title in 1980. In July 1981, upon learning from Hauser that a film based upon *Execution* would be released in January 1982 and that it would be entitled "Missing," Avon obtained from MCA a license to use the advertising logo and artwork of the motion picture "Missing" in paperback editions of the book. In early 1982, Avon released a paperback edition of *Execution* under the title *Missing*. In *Davis v. Costa-Gavras*, 580 F.Supp. at 1093, plaintiffs' claims based on the 1980 edition were dismissed for failure to comply with the New York state statute of limitations. Plaintiffs press their claim with respect to the 1982 edition.

In publishing the 1982 edition, Avon made no changes in the text of the 1978 hardcover edition; indeed, the texts of the three editions are identical inasmuch as Avon used the photographic negatives that had originally been prepared by HBJ for the hardcover edition when it published both paperback editions. Avon's editorial role in the publication of the 1982 edition was limited to changing the book's title and redesigning the cover to display the advertising logo and artwork of the film "Missing."

Prior to publication, Avon made no independent inquiry into the accuracy of Hauser's account of events surrounding the death of Charles Horman. Instead, Avon relied on the reputation of HBJ, on HBJ's assurances that the book had been thoroughly reviewed for libel prior to its original publication, and on HBJ's express warranty in the paperback licensing agreement that *Execution* "contains no libelous or unlawful matter." Vought Affidavit at 9. Avon also relied on the absence—over a period spanning almost four years from the initial release of *Execution* in hardcover—of any litigation or other indication that the veracity of the book had been challenged.

■ New York courts that have addressed the question of a publisher's liability for republication of allegedly defamatory material have consistently held that, absent some reason to believe that the material to be published is false, a republisher need not conduct its own independent accuracy check, but may instead rely on the research and reputation of the original publisher. *Yiamouyiannis v. Consumers Union*, 619 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980); *Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 416 N.E.2d 557, 435 N.Y.S.2d 556 (1980); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943, *cert. denied*, 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). Plaintiffs have not challenged HBJ's reputation in the publishing industry, and HBJ explicitly assured Avon regarding the accuracy of *Execution*.

■ Furthermore, Hearst may be held answerable in libel only if it acted with "actual malice" in connection with the 1982 republication. As United States Ambassador, United States Consul, and Commander of the United States Military Group in Chile respectively, plaintiffs Nathaniel Davis, Frederick D. Purdy, and Ray E. Davis are public officials within the meaning of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see also Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966) (plurality opinion) (" 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of government affairs"). These public officials cannot recover for a defamatory statement absent "clear and convincing" proof that "the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 725–26.

Plaintiffs contend, however, that a triable issue of fact exists as to whether Hearst acted with actual malice in publishing the 1982 edition. Avon received a copy of a letter from Judd Kessler and Nathaniel Davis addressed to Universal, MCA, HBJ, and Hauser on January 25, 1982, days before plaintiffs claim the 1982 edition was published. Plaintiffs argue that this letter constituted notice to the defendant of the false and defamatory material contained in *Execution*.

Hearst claims Avon received the letter after republication; but even assuming receipt of the letter prior to publication, plaintiffs have failed genuinely to place in issue their claim that defendant republished the 1982 edition with the requisite "subjective awareness of probable falsity or actual intent to publish falsely." *Yiamouyiannis*, 619 F.2d at 940. Kessler and Davis focus in the letter almost exclusively on material to be included in the movie "Missing." They also repeatedly distinguish the book

from the movie, noting that "a motion picture is obviously a far different medium from a book" and that "the motion picture will portray as truth a series of conjectures, 'theories,' innuendos and outright falsifications (appearing only as supposedly neutral 'questions' in the Hauser book) to the effect that Charles Horman was killed by or with the complicity of United States diplomatic, military and intelligence personnel." The only portion of the letter that complains directly of material in the book is the closing paragraph, and even there Kessler and Davis' concern appears to stem not from the book's contents, but from its release in conjunction with the motion picture:

> If we are mistaken and the motion picture in any way suggests [plaintiffs' complicity in the death of Charles Horman], ... you may be assured that appropriate action will be taken. This applies with equal force to any republication—for example, in paperback—of the Hauser book in connection with the release of the motion picture.

Hearst Exhibit G.

 The mere threat of litigation is insufficient to put a defendant on notice of "probable falsity." *Cf. Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422, 420 N.E.2d 377, 438 N.Y.S.2d 496 (1981) (finding a triable issue of malice where plaintiff "had supplied to defendant a detailed and objectively verifiable analysis" of the book's "specific inaccuracies," and defendant publisher had "itself concluded that at least some part of the material to which plaintiff had objected indeed was inaccurate," and had informed plaintiff that it would correct the inaccuracies, but then failed to implement the decision). As the court in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, 121 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), observed: "Surely liability under the 'clear and convincing proof' standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly

alert the conscientious [publisher] to the likelihood of error." Plaintiffs' unsubstantiated threat was insufficient genuinely to place in issue plaintiff's claim that Hearst published the 1982 edition of *Execution* with either knowledge of its probable falsity or actual intent to publish falsely.

### B. *The Motion Picture "Missing".*

 Plaintiffs also claim that Hearst is liable for the subsequent republication of material contained in *Execution* in the motion picture "Missing". Under New York law, liability for a subsequent republication must be based on real authority to influence the final product, not upon evidence of acquiescence or peripheral involvement in the republication process. *See Davis v. Costa-Gavras*, 580 F.Supp. at 1096; *Karaduman*, 51 N.Y.2d 531, 416 N.E.2d at 560–61, 435 N.Y.S.2d at 559–60. The record is devoid of evidence that Hearst was even peripherally involved in the production of the motion picture "Missing". Hearst's only connection to the film was a contract entered into between Avon and MCA, under which MCA licensed Avon to use the advertising logo and artwork of the motion picture in paperback editions of the book, and also agreed to include a reference to the paperback book in advertising the film. Hearst took steps to capitalize on the "movie tie-in," but this limited activity fails to demonstrate the requisite authority or control over the final product. *See Davis*, 580 F.Supp. at 1097–98.

Hauser's contract with the filmmaker, Universal, reveals that Universal was not required to obtain Avon's imput or even to consult with the publisher on the project. Under the agreement, Universal possessed the "exclusive, absolute, and unlimited right to use ... its uncontrolled discretion" to "adapt, use, dramatize, arrange, change, vary, [or] modify ..." Hauser's work. *See* letter from Universal Pictures to Thomas Hauser (April 10, 1981); Hauser Exhibit 2. Avon possessed no authority, control, or even influence over the planning, writing, production or distribution of the film. Plaintiffs, moreover, have had the opportu-

nity to depose Avon's employees regarding the relationship between Avon and the motion picture "Missing" and also to review the documents in Avon's possession relating to the motion picture. Despite this discovery, they have been unable to produce any evidence of Avon's involvement in the film. Summary judgment in Hearst's favor is therefore appropriate.

Defendant Costa-Gavras' motion to dismiss is denied and defendant Hearst's motion for summary judgment is granted.

SO ORDERED.