**Nathaniel DAVIS, Frederick D. Purdy, and Ray E. Davis, Plaintiffs,**

**v.**

**Constantin COSTA–GAVRAS, Universal City Studios, Inc., and MCA, Inc., Defendants.**

**No. 83 Civ. 2539 (KTD).**

United States District Court, S.D. New York.

Oct. 15, 1985.

Robert Kasanof and Grais & Richards, New York City, for plaintiffs.

Williams & Connolly, Washington, D.C., for Costa-Gavras, Universal City Studios, Inc. and MCA, Inc.

David Branson, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for Thomas Hauser.

Baker & Hostetler, Washington, D.C., for Hearst Corp.

Patterson, Belknap, Webb & Tyler, New York City, for Harcourt Brace Jovanovich, Inc.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

Plaintiffs filed this libel action in January 1983 in the Eastern District of Virginia. The suit was subsequently transferred to the Southern District of New York. *Davis v. Costa-Gavras,* No. 83–0019–A (E.D.Va. March 25, 1983). Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332 (1982). In this district the matter was originally assigned to Judge Abraham D. Sofaer and upon his resignation from the bench reassigned to me. While I did not attend any of the pre-trial conferences herein, I reviewed the court files and the extensive notes kept by Judge Sofaer and his staff. Plaintiffs are two State Department officials, Nathaniel Davis and Frederick D. Purdy, and a naval officer, Captain Ray E. Davis, who were stationed in Santiago, Chile in September 1973 during the military coup which deposed the Government of Salvador Allende Gossens. While stationed in Chile, Nathaniel Davis served as United States Ambassador, Frederick D. Purdy as United States Consul to the Santiago Consulate, and Captain Ray E. Davis as Commander of the United States Military Group and Chief of the United States Navy Mission to Chile.

The coup in September 1973 was violent, and resulted in the death or disappearance of many people. Among the victims was a United States citizen named Charles Horman, who disappeared from his Santiago home a few days after the military takeover. A body with fingerprints that matched Horman's was subsequently discovered in Chile. The circumstances surrounding the disappearance and death of Horman attracted the attention of the author Tom Hauser, who researched and wrote what purports to be a nonfiction account of Horman's death, entitled *The Execution of Charles Horman: An American Sacrifice ("Execution")*. Harcourt Brace Jovanovick, Inc. ("HBJ") published Hauser's work in hardcover in 1978. The book, republished in paperback by The Hearst Corporation ("Hearst"), was the basis for the motion picture "Missing," directed by Constantin Costa-Gavras ("Costa-Gavras") and released by Universal City Studio's, Inc., ("Universal"), a wholly owned subsidiary of MCA, Inc. ("MCA").

The film, set in Santiago, Chile, dramatizes the search for Horman carried on by Horman's wife, Beth, and father, Ed, in the weeks following Horman's arrest and exe-

cution. Through the use of flashbacks, the film also depicts the events immediately preceding Horman's disappearance. Although necessarily a dramatization, the film purports to be factual and historically accurate. The movie was billed in advertisements carried by all leading newspapers as "[b]ased on a true story." *See* Richards Affidavit, Exh. A. And in the opening scenes of the film, a narrator reads a statement that is flashed on the screen: "This film is based on a true story. The incidents and facts are documented. Some of the names have been changed to protect the innocent and also to protect this film." Combined Continuity Transcript of Motion Picture Missing at 4 (hereinafter cited as "Transcript"). The film, moreover, conveys the impression of historical accuracy by depicting a real-life event—the coup in Chile which deposed Allende's government—and by using the names of actual cities in Chile, including Santiago and Vina del Mar, *see, e.g., id.* at 10, 141, and referring to actual persons, including Charles, Ed, and Beth Horman, Mayor Koch, and Senator Magnuson. *See id.* at 43.

Plaintiffs named as defendants the author Hauser, publishers HBJ and Hearst, and filmmakers Costa-Gavras, Universal, and MCA; they claim that defendants, through publication of the books and release of the film, falsely accused them of "order[ing] or approv[ing] the order for the murder of Charles Horman." Complaint ¶¶ 4, 23, 32, 39, 46. In an opinion and order dated February 7, 1984, motions for summary judgment by the defendants Hauser and HBJ were granted, *Davis v. Costa-Gavras,* 580 F.Supp. 1082 (S.D.N.Y.1984); in an opinion and order dated October 16, 1984, defendant Hearst's motion for summary judgment was granted. *Davis v. Costa-Gavras,* 595 F.Supp. 982 (S.D.N.Y. 1984). The remaining defendants, Costa-Gavras, Universal, and MCA, then moved this court pursuant to Rule 12(c), Fed.R. Civ.P., for judgment on the pleadings on the ground that the motion picture "Missing" is not, as a matter of law, reasonably susceptible of the defamatory meaning ascribed to it by plaintiffs. In the alternative, defendants contend that the complaint

should be dismissed as to two of the plaintiffs, Nathaniel Davis and Frederick D. Purdy, on the same ground. It is this latter motion which was *sub judice* when the case was reassigned to me and is the subject of this decision.

As originally drafted, plaintiffs' complaint was ambiguous as to whether plaintiffs alleged a single false and defamatory statement—that plaintiffs ordered or approved the order for the murder of Charles Horman—or multiple false and defamatory statements, including not only statements of complicity in murder, but also accusations that plaintiffs were callous, incompetent, and faithless to their offices. Judge Sofaer afforded plaintiffs an opportunity to amend their complaint "[i]f plaintiffs intend to prove at trial that the [passages of the film] complained of have other false and defamatory implications." Order, October 9, 1984. At a status conference held on October 29, 1984 at plaintiffs' request, Judge Sofaer explored with plaintiffs' counsel the question whether plaintiffs intended to challenge any additional defamatory statements allegedly made by the film. The plaintiffs agreed to file an amended complaint which would precisely set forth any additional defamatory statements of which they complained. The plaintiffs filed an amended complaint on December 18, 1984, which, despite minor additions and alterations, realleged a single defamatory statement as the sole basis for this lawsuit: that the film accused plaintiffs of ordering or approving the order for the murder of Charles Horman. Amended Complaint ¶¶ 16, 23, 32. Plaintiffs subsequently confirmed by letter that "plaintiffs' Amended Complaint indeed does not contain any new allegations of defamation...." Letter from Robert Kasanof, counsel to plaintiffs, to this court (January 10, 1985).

With the complaint thus clarified and the issue squarely joined, defendants have renewed their motion for judgment on the pleadings on the ground that the movie "Missing" is not reasonably susceptible of the sole defamatory meaning ascribed to it in the amended complaint. For the reasons set forth below, defendants' motion is

granted with respect to plaintiffs Nathaniel Davis and Frederick D. Purdy, but denied with respect to Captain Ray E. Davis.

 A statement is defamatory if it tends to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or if it tends to excite adverse, derogatory, or unpleasant feelings or opinions about the plaintiff. *See* Prosser, *Handbook of the Law of Torts* § 111, at 739 (1971). Defendants have conceded that, if "Missing" stated or implied that the plaintiffs ordered or approved the order for the murder of Charles Horman, that statement would be defamatory as a matter of law. *See* Memorandum of Points and Authorities of Defendants Constantin Costa-Gavras, Universal City Studios, Inc., and MCA, Inc., in Support of their Motion for Judgment on the Pleadings at 13 (hereinafter cited as "Defendants' Memorandum"). To be actionable, a defamatory statement must be "of and concerning" the plaintiff. The test is whether a reasonable person, viewing the motion picture, would understand that the character portrayed in the film was, in actual fact, the plaintiff acting as described. *See Youssoupoff v. Metro-Goldwyn Mayer Pictures*, 50 Times L.R. 581 (Eng.Ct. of App.1934), *reprinted in* 99 A.L.R. 864, 866–67; Note, *Clear and Convincing Libel: Fiction and the Law of Defamation*, 92 Yale L.J. 520, 524 (1983). Defendants have conceded, for purposes of this motion only, that the three American officials depicted in "Missing"—Consul Putnam, Captain Tower, and the Ambassador—were intended and understood to represent the plaintiffs in this case. *See* Defendants' Memorandum at 3, 17; Reply Memorandum of Points and Authorities of Defendants Constantin Costa-Gavras, Universal City Studios, Inc., and MCA, Inc., in Support of their Motion for Judgment on the Pleadings at 5 (hereinafter cited as "Defendants' Reply Memorandum"). Thus, the sole question to be decided on this motion is whether the film is reasonably susceptible of the meaning ascribed to it by plaintiffs.

 The question whether a communication is capable of bearing the particular defamatory meaning ascribed to it by a plaintiff is one of law for the court to decide. *See, e.g., El Meson Espanol v. NYM Corporation*, 521 F.2d 737, 739 (2d Cir.1975); *Lorentz v. R.K.O. Radio Pictures*, 155 F.2d 84, 87 (9th Cir.), *cert. denied*, 329 U.S. 727, 67 S.Ct. 81, 91 L.Ed. 629 (1946); *Bordoni v. New York Times Company, Inc.*, 400 F.Supp. 1223, 1230 (S.D.N.Y.1975) (Weinfeld, J.). In resolving this question, the movie must be viewed as a whole, and the challenged passages given their "natural import and their plain and ordinary meaning." *Bordoni*, 400 F.Supp. at 1230. The communication complained of will be given a "fair" rather than a "broad" interpretation, *Drug Research Corporation v. Curtis Publishing Company*, 7 N.Y.2d 435, 199 N.Y.S.2d 33, 36, 166 N.E.2d 319, 321 (1960). And the court will neither "strain to find a defamatory interpretation where none exists," *Cohn v. NBC*, 50 N.Y.2d 885, 430 N.Y.S.2d 265, 408 N.E.2d 672, *cert. denied*, 449 U.S. 1022, 101 S.Ct. 590, 66 L.Ed.2d 484 (1980), nor "interfere with the jury's role by treating as nondefamatory a statement that a reasonable juror may fairly read in context as defamatory." *Sharon v. Time, Inc.*, 575 F.Supp. 1162, 1165 (S.D.N.Y.1983).[1] If the

---

1. Defendants contend that the "most important" principle of construction to be applied by the court in deciding whether the communication complained of by plaintiffs is capable of the defamatory meaning ascribed to it is that "the sole function of an innuendo is to explain what the words meant to those to whom they were published; it cannot add to, alter, or enlarge the ordinary sense or natural meaning of the published words." Defendants also contend that "the office of an innuendo is not to 'beget an action....'" Defendants' Memorandum at 6–7 (quoting *Okun v. Superior Court*, 629 P.2d 1369,

1373, *cert. denied*, 454 U.S. 1099, 102 S.Ct. 673, 70 L.Ed.2d 641 (1981)).

Defendants confuse inference with innuendo. A communication may be defamatory on its face, by direct statement or inference therefrom, or it may convey a defamatory meaning only by reason of extrinsic facts. If language on its face is innocent, and the defamatory meaning arises only from the facts not apparent upon the face of the publication—for example, if the communication states simply that Dick and Jane spent the night in a hotel without stating the fact that they were unmarried—the

court determines that the challenged communication is reasonably susceptible of the defamatory connotation alleged by plaintiffs, it becomes the function of the jury to assess whether that was the sense in which the film was likely to be understood by the average viewer. *See Mencher v. Chesley,* 297 N.Y. 94, 102, 75 N.E.2d 257, 260 (1947). Similarly, if the communication at issue is reasonably susceptible of more than one meaning, one innocent and the other defamatory, it is for the jury to determine which meaning was actually conveyed. *See Rudin v. Dow Jones & Company,* 510 F.Supp. 210, 213 (S.D.N.Y.1981); *Rovira v. Boget,* 240 N.Y. 314, 316–17, 148 N.E. 534 (1925). The standard is not whether the statements are exclusively susceptible of the meaning alleged by the plaintiffs, but whether such an understanding is a reasonable one. *McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 717 F.2d 1460, 1465 (D.C.Cir.1983).

■ A libel action is "personal to the plaintiff and cannot be founded on the defamation of another." Prosser, *Handbook of the Law of Torts* § 111, at 744 (1971); *see also Arcand v. Evening Call Publishing Company,* 567 F.2d 1163, 1164 (1st Cir.1977) (an individual member of a group has no civil action for defamation of the group unless he can show "special application of the defamatory statement to himself.") (quoting Tanenhaus, *Group Libel,* 35 Cornell L.Q. 261, 263 (1950)); *Fowler v. Curtis Publishing Company,* 78 F.Supp. 303, 304 (D.D.C.1948) ("It is well established that only a party concerning whom the defamatory matter is published may maintain an action for libel"). Thus, plaintiffs Purdy, Nathaniel Davis and Ray Davis can maintain a libel suit based on the claim that "Missing" charges American complicity in the Horman murder only if the film can reasonably be understood to accuse them each as individuals of such complicity.

Because the movie "Missing" depicts Captain Tower, Putnam, and the Ambassador differently, employing them in different scenes, and drawing a number of important distinctions among them, each plaintiff's claim to have been defamed by "Missing" must be assessed separately.

### 1. *Captain Tower*

■ The movie "Missing" is reasonably susceptible of the meaning that plaintiff Ray E. Davis, as depicted by Captain Ray Tower, ordered or approved the order for the murder of Charles Horman. The movie makes several statements of fact which, when considered together, give rise to a reasonable inference that Tower ordered or approved Horman's murder. The movie first presents sufficient facts to enable a viewer reasonably to conclude not only that plaintiff Ray Davis was in a position to order the Chilean military to execute Charles Horman, but also that such an execution could not have occured absent such an order or other, similar indication of official American approval. Second, the movie develops a motive for plaintiff Davis to have ordered Horman's death—the concern that Horman had learned too much about the American military role in the coup, and the desire to contain that knowledge and prevent its dissemination. Third, the film connects Tower personally to the circumstances surrounding Horman's death and disappearance. A reasonable person viewing the movie could infer from these statements and suggestions, and in particular from the film's depiction of Ray Davis' authority and motive to act, that Davis in fact so acted. Although the movie nowhere directly states that Davis ordered or approved the order for Horman's murder, the court need not presume the jury wholly wanting in common sense and simple logic. A jury is free to draw all reasonable infer-

---

plaintiff has the burden of pleading and proving the facts necessary to establish the defamatory sense of the publication. Innuendo is the logical connection between the allegedly defamatory communication and the extrinsic fact, and its role is simply to explain the communication in light of the extrinsic facts. Prosser, *Handbook of the Law of Torts* § 111, at 748–49

(1971). The movie "Missing," if it charges plaintiffs with complicity in Horman's murder, does so "on its face"—by its language, by the progression of its scenes, by the conduct of the characters portrayed, and so forth—and not by reference to extrinsic facts. Defendants' extensive argumentation with respect to innuendo is therefore misplaced.

ences, implications, and insinuations from particular passages of the film, considered in context, and from the film considered as a whole. *See Sharon,* 575 F.Supp. at 1172 n. 5. The fact, moreover, that a reasonable viewer might interpret the film to state that the Chilean Military was alone responsible for Horman's death is irrelevant with respect to the threshold issue of whether the film is reasonably susceptible of the defamatory meaning ascribed to it by plaintiffs. *See Mencher,* 297 N.Y. at 102; 75 N.E.2d at 260.

The movie develops Captain Tower's power or authority to order the Chilean Military to execute Horman by portraying Tower as someone with close connections to the recently installed Junta. The movie opens with Horman and a friend, Terry Simon, in a car driven by Ray Tower. We later learn that they are being driven back to Santigo from Vina del Mar, where they were trapped overnight when all roads were closed during the coup. Tower's car is stopped at a checkpoint by a Chilean soldier, who demands identification. When Tower shows his identification, the soldier apologizes and salutes Tower. *See* Transcript at 4. The fact of Tower's close connections to the Junta is further developed in a meeting at the Ambassador's office. Following a discussion of what is known about Horman's whereabouts, Tower explains to Beth and Ed Horman, "I may have some further ... news for you after tonite. I'm having dinner with the uh, ... Junta's chief of staff, Admiral Huidobro." *Id.* at 57. Beth responds, "God, that one again? Haven't you seen him yet?" *Id.* In a later scene involving Terry, Beth, and Ed Horman, the point is reiterated:

Beth: ... Terry, guess who's having dinner together again tonight?
Terry: Admiral Huidobro?
Beth: U-huh
Terry: You've gotta be kidding me. Again.
Beth: Again. Can you believe that guy? *Id.* at 71.

The filmmakers again pick up on the theme of Tower's connections to the Chilean Military when Tower asks Beth if she has "a list of Charles' friends ... so I [can] extend this investigation." *Id.* at 58. Upon leaving the meeting, Ed Horman remarks to Consul Putnam, "I'll see that [Captain Tower] gets that list in the morning." Beth responds, "Not from me he won't." *Id.* at 59. Beth later explains to Ed Horman her refusal to give the list of Charles' friends to Tower: "Ed, five minutes after I give that list to Tower, those friends will probably be arrested by the Military." *Id.* at 90.

In a flashback to the day that Horman and Terry were trapped in Vina del Mar, the film depicts Horman in a hotel meeting an American named Andrew Babcock. Responding to Horman's question whether he was a tourist, Babcock explains that he was in Vina del Mar because "... the Navy sent me down here to do a job and, uh, ... she's done." As a military man enters the hotel, Babcock gets up to leave, saying "Oh, there's mah man from Milgroup." Charles asks "Milgroup? What's Milgroup?" Babcock responds "Milgroup's just ... U.S. Military Group." *Id.* at 67–68. Through this scene the filmmakers strongly suggest American military involvement in the coup and again connect Tower, who is the senior officer of Milgroup, to the recently installed Junta.

In another flashback, the filmmakers depict Horman in a conversation with the Colonel, the man that Babcock referred to earlier as "mah man from Milgroup." In a conversation with the Colonel at a "going away barbecue" before Horman leaves to go back to Santiago, he asks the Colonel, "So you guys friendly with the local military down here?" The Colonel responds "Oh, some. I took Admiral Huidobro to the United States to buy arms last July." *Id.* at 142. In an exchange which all but confirms Tower's close affiliation with the Junta, the Colonel inquires of Horman, "Charlie, you're determined to go back [with Tower this afternoon]?" Charles responds, "Mhm." The Colonel then states: "Do you know about the [anti-Junta] rebels? Ray Tower is number two on their hit list. I wouldn't ride with him." *Id.* at 143.

A reasonable person viewing the foregoing scenes in the context of the film as a whole could reasonably interpret the film to state that Ray Tower had extensive contacts with the Junta and that Milgroup, of which Tower was the senior officer, played a significant if not determinative role in effectuating the coup that installed the Junta. A jury could reasonably infer from such statements that Tower was in a position to "order or approve the order" for the execution of Charles Horman by the Chilean Military.

The defendants also present sufficient facts in "Missing" for a viewer reasonably to conclude that Ray Davis had a motive to order or approve the order for Horman's murder. The filmmakers establish the existence of such a motive by (1) portraying an extensive and official American involvement in the coup; (2) picturing Horman gathering information about that involvement from American military officers while he was trapped in Vina del Mar; and (3) depicting Horman's affiliation with a leftist newspaper, Fin. On the basis of these three statements, considered in the context of the film as a whole, a viewer could reasonably conclude that Ray Davis had a motive to silence Horman: to prevent an expose of the secret, and politically highly sensitive, supposed official American military role in the coup.

Official American military involvement in the coup is suggested and stated throughout the movie. In an early scene, the filmmakers flashback to a conversation between Horman and a reporter he met shortly after returning from Vina del Mar and immediately following the coup. The reporter, Kate Newman, asks, "When were you in Vina?" Horman responds, "we just got back yesterday. You wanna hear somethin' strange? Our hotel was full of American military officers." Newman says "I'd forget about that." The filmmakers repeat this statement later, through Terry, Horman's friend who was with him at the hotel in Vina. In a conversation among Terry, Ed Horman, and Beth, the following dialogue takes place:

*[Ed] Horman:* That's the morning the coup started?

*Terry:* You've got it.... The twenty-four hour curfew had shut everything down. The phones were out....

*[Ed] Horman:* ... What happened next?

*Terry:* Well, we stayed at the hotel. We didn't have much choice.

*Beth:* And that's when you met all the Americans, right?

*Terry:* That's right.

*[Ed] Horman:* And they were caught up by the coup, also?

*Id.* at 63–64. Following Ed Horman's last question, "Terry looks from Horman to Beth several times reacting." *Id.* at 64. Beth later explains, "Ed, all those American officials in Vina were probably involved in the coup." *Id.* at 69.

The fact of official American Military involvement in the coup is all but established by the filmmakers through a flashback to Horman's meeting while in Vina del Mar with the American naval officer, Andrew Babcock. Horman asks: "Are you a tourist?" Babcock says, "No, not exactly," explaining that "the Navy sent me down here to do a job and, uh, ... she's done." *Id.* at 66. Later in the film, this flashback to Horman and Terry's meeting with Babcock is repeated more fully:

*Charles:* Well, what are you doin' down here?

*Babcock:* Oh, the Navy sent me down to do a job, ... she's done.

*Terry:* Do you have any idea how long we'll be stuck here in Vina?

*Babcock:* About a week, but don't worry, ... everything's all right. The coup went very smoothly. You're completely safe.

*Charles:* Was it planned very far in advance?

*Babcock:* Terry, ... does a bear shit in the woods?

*Charles:* H'h, now, will the U.S. government recognize the new government?

*Babcock:* Oh, I don't know. That's up to the politicians.

*Id.* at 135–36.

The allegation of an extensive and official American military role in the coup is

again made apparent by the filmmakers in a scene involving Horman and the Colonel, Babcock's "man from Milgroup." Charles asks: "Colonel, do you mind if I ask you a question?" The Colonel, laughing, responds, "Certainly, go ahead." Charles asks, "How do you feel about the coup?" The Colonel explains: "Very good. I've been in a lot of, uh, ... frustrating situations before this. I was in Key West waiting for the Bay of Pigs. I even took an advanced scuba course for that invasion. If Kennedy had provided decent air cover, proper military support ... there, we wouldn't be having these problems here." *Id.* at 140.

The filmmakers develop Tower's motive to order or approve the order for Horman's death by depicting Horman gathering information, learning too much, and keeping a notebook documenting the American military involvement in the coup. In an early scene, the filmmakers flashback to the evening that Horman and Terry arrive back in Santiago from Vina del Mar, and Tower leaves them at a hotel. Because of the curfew, they must stay overnight in the hotel. As Terry prepares to go to bed, Charles "turns to the desk and begins to write ... in [a] notebook." *Id.* at 8. Terry asks, "Charles, you think it's smart to keep all those notes?" *Id.* at 8–9. Emphasizing the point, the camera closes in on Charles' notebook as he makes the following entry: "3:10 a.m. Terry just asked if it's smart to take all those notes." *Id.* at 9. We later learn that Charles' notetaking was designed to document the American role in the coup. After a flashback to Charles' meeting with Babcock in which Charles turns to Terry and says, "I can't believe he just told us all that," the filmmakers return to the present and to a conversation among Terry, Ed Horman, and Beth. Terry says, "That's when he decided that we should both take notes." "Notes on what?", Ed Horman asks. Beth, interrupting, says with exasperation, "Didn't you hear what she just said? Ed, all those American officials in Vina were probably involved in the coup." *Id.* at 69.

The filmmakers' portrayal of Charles as someone who is "learning too much" is developed also in the conversation between Horman and Babcock. At the close of that conversation, after Babcock has essentially informed Horman of the American involvement in the coup, Charles asks if he can borrow Babcock's newspaper. Babcock responds: "Well, (sighing) I'm afraid there isn't much in there for someone with such big ears and such a long nose." *Id.* at 68. This depiction of Charles as someone with big ears and a long nose is later corroborated by the filmmakers through the statement of a friend of Charles', who explains to Beth and Ed Horman: "You know, Charlie was always asking questions ... taking notes on everything." *Id.* at 119. And again toward the close of the film, in a meeting between Tower, the Ambassador and Horman, Tower states: "Ed, but I understand ... he was a bit of a snoop, ... who poked his nose around in a lot of dangerous places where he didn't really belong." *Id.* at 162.

The plausibility of a motive in Tower to silence Horman is accentuated by the filmmakers' portrayal of Horman as a writer affiliated with a leftist newspaper, Fin. The reporter Kate Newman, depicted throughout the film as an intelligent, thoughtful, and credible individual, makes this point. She observes, thinking out loud: "Most people think the coup was prepared in Vina. Now, if we weren't involved in the coup, ... whatever Charlie saw or heard down there is meaningless. But if we were, ... it still doesn't mean much, ... but ... it could be significant. At least, enough for somebody to take a look at his jacket." Ed Horman interposes, "What? His what?" Newman explains, "Oh, uh, his record. They keep a file on every American national living down here. So, if somebody decided to review that file and found that Charlie ... worked for Fin, ... they might conclude that he was a guy that was well worth watching." Beth asks, "Do you think that's what happened?" Newman responds, sighing, "It seems possible." *Id.* at 144.

The filmmakers thus create a scenario in which Tower not only has the capacity to "order or approve the order" for Horman's

murder because of his extensive contacts with the Chilean military, but also a plausible motive for doing so. A reasonable viewer might infer from these two facts alone that Tower ordered or approved the order for Horman's murder. The filmmakers go even further, however, suggesting that Horman, because of his American citizenship, could not have been killed by the Chilean military absent a "kill order" from an American officer. In an early scene in Santiago immediately following the coup, Terry warns Charles as they are splitting up, "Be careful." Charles responds, "Hey, don't worry. [The Chileans] can't hurt us. We're Americans." *Id.* at 28. This statement is reinforced later by a friend of Charles, Frank, who also worked for Fin. After Frank and another writer for Fin, David, were picked up by Chilean soldiers, Frank turns to David, reassuring him, and says, "David, come on. They can't kill us. Our Embassy'll go bananas." *Id.* at 99.

In the scene which most powerfully suggests that Horman could not have been killed absent American complicity, Beth, Ed Horman, and Newman meet with a man named Paris in the Italian Embassy. A police officer who had worked for the Junta for two weeks, *id.* at 130, Paris is described by the Italian Ambassador as "a desperate man," *id.* at 125, and by Newman as someone who talks in order to stay alive, *id.* at 131. Although his credibility is thus called sharply into question, he nevertheless reports in a believable manner what he learned from a colonel in the Junta. This Colonel, according to Paris, was present at a meeting with a General of the Junta and an American officer when the decision was made that the "prisoner"— "Horsman" or "Horman"—must "disappear." In a flashback which enhances the credibility of Paris' report, Horman is clearly pictured tied to a chair in a small room behind where the General, the Colonel, and the American officer are pictured. *Id.* at 126. Newman asks Paris bluntly "what we need to know is can they [the Chileans] order an American to disappear without consulting ... the Americans first?" Paris responds, corroborating the earlier statements by Horman and Frank

Teruggi, "Oh, no, no. No, they wouldn't, ... they wouldn't dare." Horman asks Paris, "How can I verify that?" Paris responds, "You can't." *Id.* at 130–31.

This scenario of a high-ranking American officer with the capacity and motive to murder Charles Horman, together with the suggestion that absent an American "kill order" no such execution could have occurred, gives rise to a reasonable inference that Tower so acted. The inference that Tower, and not some other American official such as Babcock or the Colonel, was the American who issued or approved the order becomes a strong one, as the filmmakers focus in on Tower and tie him in directly with the circumstances surrounding Horman's death and disappearance. First, Tower plays a more significant role in the film than any of the other American officers. He is the one who meets Charles in Vina del Mar and gives him a ride back to Santiago. He is also the senior officer of Milgroup, and it is Milgroup's offices which are just down the hall from the Defense Ministry where, Paris related, the "prisoner" was interrogated and then ordered to disappear. The suggestion that the American officer present at that meeting was a Milgroup officer is thus clear. Although plaintiff contends that in the flashback to that meeting, the American officer pictured there is "meant to look like Ray Tower," Plaintiffs' Second Memorandum of Law in Opposition to Defendants' Motions to Dismiss at 12, the scene appears on the screen for too brief a period to perceive what the American officer looks like, much less who he is. The suggestion, however, that it was a Milgroup officer that was present tends to implicate Tower in the plan to execute Horman inasmuch as Tower was the senior officer of Milgroup.

In a flashback scene involving Beth and Tower, the filmmakers again suggest that Tower was involved in the murder of Horman. The context for the scene is set in a conversation among Beth, Terry, and Ed Horman, in which Terry explains to Ed Horman that, when Charles first disappeared, she and Beth contacted Ray Tower. *Id.* at 71. Beth continues, explaining that

Tower invited them to dinner at his house to meet Admiral Huidobro, who never showed up. By the time they realized the Admiral was not going to arrive with the hoped-for information about Charles' whereabouts, it was past curfew and Tower insisted they stay the night. At that point, the filmmakers flashback to a scene in Tower's home. Beth is taking a bath, when Tower walks in with a drink in his hand. As Beth attempts to repulse his obvious sexual overtures, insisting that he "get outta here," Tower says,

> You know, if I were you, I'd quit living in the past. I think it's about time you started thinking about your future. You've gotta learn to stay ahead of the power curve, kid. You know what I mean? ... You see, if a pilot gets ahead of the power curve and something happens, then he can just always pull out of the way.... But if he falls ... behind the power curve and something ... happens then ... it's just 'Adios, pal.' You gotta learn to stay ahead of the power curve, kid.

*Id.* at 74–75. A viewer of the movie, considering this scene in the context of the film as a whole, could reasonably infer that Tower, the day after Horman's disappearance, knew that Horman was dead. In particular, his statement to Beth that she should stop living in the past, made in the context of her rebuff of his sexual advances, can reasonably be interpreted to suggest that he knows her husband is dead and therefore "it's about time you started thinking about your future." His statements, "fall[ing] behind the power curve," "something happen[ing]," and "it's just 'Adios, pal,'" can similarly be understood as references to Horman's death. The fact that Tower appears somewhat drunk in this scene does not undercut the reasonableness of the inference of his knowledge; to the contrary, the fact that he has been drinking enhances the credibility of what he is saying: his inebriation helps explain his talking too much and his vulgarity.

The interpretation of the film as a whole to suggest Tower's complicity in the murder of Horman is further corroborated by two scenes involving a check and re-check of morgue fingerprints in an effort to locate Horman. In the first scene, which takes place at the American Embassy, Beth and Ed Horman meet with the Ambassador, Tower, Consul Putnam, and Defense Attache, Colonel Clay. In response to Ed Horman's question about what progress has been made in locating his son, Clay responds, "... we also had a fingerprint check made at all the morgues. They came up negative." Horman asked, "Do you trust your sources?" Clay responded, "Captain Tower checked them himself." Beth remarks sarcastically, "Oh, well, then, I'm sure they're impeccable." Later, toward the end of the film, we learn that Clay's source was unreliable. After Ed Horman learns through an employee of the Ford Foundation that his son was executed in the stadium shortly after his arrest, and confronts Putnam, the Ambassador, and Tower with this information, Putnam informs Horman that his son was indeed executed in the stadium. He states: "I looked into that, uh, Ed, and it appears that you were right. Yes, we've been informed that, uh, the body has been identified through, uh, a re-check of morgue fingerprints." *Id.* at 165.

A reasonable viewer, considering these scenes in the context of the film as a whole, could infer that Tower's inaccurate check of morgue fingerprints was deliberate—in other words, that Tower was directly involved in the murder of Horman and wanted to keep at bay those who sought to discover the circumstances surrounding Horman's disappearance and death. The plausibility of this inference is heightened by the narrator's statement at the close of the film that "[t]he body was not returned home until seven months later, making an accurate autopsy impossible." *Id.* at 173. That Tower was concerned lest Beth and Ed Horman discover too much about Horman's death is also suggested by a scene in which Beth reveals her suspicion that Tower is tapping her and Ed Horman's phones in the hotel where they are staying. In this scene, Beth and Ed Horman return to the hotel and, upon entering Mr. Horman's room, discover a man "fixing" his tele-

phone. Ed Horman exclaims, "What? Uh, What are you doing?" The man replies, "I fix the telephone." Horman says, "The telephone works perfectly." The man says, "now is working better" and then leaves. Beth reports "They fixed mine yesterday." Horman, in disbelief, says "How can he be that brazen about it," as Beth leans over by the phone and says "Hello, Ray Tower! How's every little thing over there in your electronic game room?" *Id.* at 102. There is no proof that Ray Tower is in fact responsible for tapping their phones or even that the phones were actually tapped, but the suggestion is unmistakable. In the context of the film as a whole, moreover, this suggestion is not incredible.

These scenes, one after another, establishing Tower's capacity and motive to act and then relentlessly tying him personally to the circumstances surrounding Horman's death, legitimize Horman's fear of this individual, which the viewer is introduced to in the opening scenes of the film. When Charles and Terry arrive back in Santiago with Tower, Charles insists that Tower drop them off at a hotel. Terry asks, "Why didn't you let him drive us home?" Charles responds, "I didn't want him to know where I live." Terry asks "What?" And Charles repeats, "I didn't want him to know where I live." *Id.* at 6.

This scenario of Horman's death which the film has been developing is articulated at the close of the film. Ed Horman, pointedly directing his statement to Tower and the Ambassador, says "I have reason to believe that my son was killed by the Military.... And I ... do not think that they would dare do a thing like that unless an American official co-signed a kill order." *Id.* at 158. The weight of this charge is heavy. First, the charge is made toward the end of the film, after the filmmakers have provided ample basis for Mr. Horman's conclusion. And second, Mr. Horman is portrayed as a man who would not make such a charge lightly. In the early scenes of the film, Ed Horman is portrayed as strikingly diffident and conservative, always deferring to the callous and indifferent state department and congressional of-

ficials he encounters. As the film progresses, however, the filmmakers document Horman's transformation as he is forced to shed his diffidence and conservatism in light of the evidence he uncovers regarding the American role in the coup, and the circumstances surrounding his son's death. Horman's transformation into someone who could charge American officials with complicity in his son's murder renders his charge all the more dramatic; and that transformation, together with the other suggestions and statements in the film, tends to corroborate Ed Horman's charge.

That Tower immediately denies Ed Horman's charges, analogizing the circumstances of Charles' death to those of a killing by the mafia in New York, *id.* at 162, does not undermine the credibility of Ed Horman's charge. Tower's denial may reasonably be construed in a manner consistent with culpability; a reasonable viewer could conclude, particularly in the light of the film considered as a whole, that Tower was simply continuing his efforts to protect himself by keeping secret the truth regarding the circumstances of Charles' death.

In support of their contention that the movie is incapable of the defamatory meaning ascribed to it by plaintiffs, defendants contend that "the film as a whole studiously and deliberately leaves open the precise nature of American involvement, if any, in Charles Horman's disappearance and death." Defendants' Reply Memorandum at 21. Defendants cite the closing lines in the film which are flashed on the screen and read by a narrator:

> Ed Horman filed suit charging government officials including Henry A. Kissinger, with complicity and negligence in the death of his son.... After years of litigation, the information necessary to prove or disprove complicity remains classified as secrets of State. The suit was dismissed.

Transcript at 172–73.

Although neutral when read in the abstract, the statement in context, coming as

it does at the very end of the film, can be read to suggest that Ed Horman's suit was dismissed because the State Department refused to release secret documents that would have corroborated his claim. Thus, contrary to defendants' contentions, a viewer of the film could reasonably understand that statement, considered in the context of the film as a whole, to suggest, imply, or insinuate that the State Department had hidden from public view evidence of American complicity in the September 1973 coup and in the death of Charles Horman.

To conclude that "Missing" is reasonably susceptible of the interpretation that Ray Tower ordered or approved the order for Horman's murder is not to suggest that it is the only reasonable interpretation of the film or even the most reasonable interpretation. A reasonable viewer might infer from the film as a whole that it stated or suggested only that the Chilean military was responsible for the murder and that the American officers were simply indifferent to Horman's plight and to his family's efforts to discover the truth behind his disappearance. This interpretation finds support in the filmmakers' portrayal of the Chilean soldiers as an essentially lawless group, responsible for the indiscriminate killing of many people, and also in the fact that another American, Frank Teruggi, is depicted as having been killed by the Chileans. In connection with Teruggi's death, there is no suggestion by the filmmakers of an American motive to silence him or of American approval of his murder. There is even a suggestion that he was picked up and executed by the Chileans because of his affiliation with the leftist newspaper, Fin. *See id.* at 93–94 (depicting Frank and David, both writers for Fin, being arrested by soldiers in apartment that appears to be offices for Fin). *But see id.* at 100–101 (David responding to Ed Horman's question regarding whether their work for the newspaper could be the reason they were all arrested, explaining, "They never even interrogated me about it."). This interpretation arguably derives further support from Ed Horman's parting statement in the airport that he is going to sue "everybody who *let that boy die.*" *Id.* at 172. Anoth-

er interpretation that a viewer might reasonably adopt is that the movie suggested an American role in Horman's death that was limited to a "cover-up" of the Chilean Military's action. Where a communication is reasonably susceptible of more than one meaning, however, the question of which meaning was actually conveyed to the average reader by the film is for the jury to determine. *See Mencher,* 297 N.Y. at 102; 75 N.E.2d at 260. Thus, defendants' motion to dismiss Ray Davis' complaint on the ground that the movie "Missing" is not reasonably susceptible of the interpretation that Davis ordered or approved the order for the murder of Horman is denied.

## II. *Consul Putnam*

Defendants have also moved to dismiss Frank Purdy's complaint on the same ground. Defendants are correct in their contention that "Missing" is not reasonably susceptible of the meaning that Purdy, as portrayed by Consul Putnam, ordered or approved the order for the murder of Charles Horman. Defendants' motion for judgment on the pleadings is therefore granted with respect to Purdy's complaint.

Purdy is not favorably portrayed in "Missing." At best, he appears incompetent, indifferent, and faithless to his office. *See, e.g.,* Transcript at 48–49 (Beth explains to Ed Horman as Putnam leaves that she doesn't "expect a whole helluva lot anymore," and that Charles has "been gone two weeks ... and I don't know, they ... (sighing) give me the same song and dance over and over again. He could be hurt or, ... tortured. They don't give a goddam ... about him."); *id.* at 169–70, 173 (at the airport as the Hormans are departing, Putnam gives Beth his word that Horman's body will be shipped home in a few days; we learn later from the narrator that "the body was not returned home until seven months later"). At worst, he is portrayed as a liar, *see id.* at 58–59 (Putnam asserts he received no calls from Charles' friends, but when Beth calls him on it with convincing proof, he recants his statement and unpersuasively explains to the Ambassa-

dor, "I forgot that sir. You're right [Beth]. Yes, I think I do remember,") and a participant in an effort to coverup the circumstances surrounding the disappearance and death of Charles Horman. *See, e.g., id.* at 55 (Putnam advancing theory that Horman "must be in hiding," rendered implausible by movie's strong suggestion, through use of flashbacks, that Horman was picked up by Chilean soldiers); *id.* at 148 (Putnam advancing theory to account for Teruggi's death—that Teruggi was picked up for curfew violations, detained at the stadium, released, and found dead on the street later—rendered highly implausible by movie's virtual statement, through use of flashback, that Teruggi was picked up by Chilean soldiers in the offices of Fin and by strong suggestion, again through use of flashbacks, that he was executed at the stadium); *id.* at 158 (Putnam responding to Ed Horman's statement that his son was executed at the stadium, not by denying it, but by asking "Who told you that?", thus suggesting his knowledge that Horman was dead); *id.* at 165 (portraying Putnam as able to locate Horman's body immediately after Horman acquires knowledge of his son's death, thereby further suggesting that Putnam was aware before Horman's statement that Charles was dead); *id.* at 173 (implicit suggestion by narrator that the body was not shipped home for seven months in order to preclude the possibility of an accurate autopsy). But the movie cannot reasonably be interpreted to suggest that he ordered or approved the order for Horman's murder.

First, there is no suggestion that Purdy was in a position to effectuate a kill order. He is portrayed as a low-level member of the American diplomatic corps in Chile. He meets Mr. Horman at the airport, sets up meetings for the Hormans with the Ambassador, and arranges for the Hormans to be escorted through local hospitals as they search for Charles. His relationship to the Ambassador and Tower is not depicted as a close one, either personally or professionally; and Putnam is clearly far subordinate to these two men in both position and authority.

Second, there is no suggestion in the film that Putnam had ever met or even knew of Charles Horman prior to his disappearance. And there is no suggestion that Putnam was in a position to know about Horman's documentation of the American role in the coup. There is thus no suggestion in the film that Putnam was in a position to develop a motive to silence Horman.

Third, when Horman levels his charge that he believes his son was executed by the Military and that the Military wouldn't have dared to execute him absent an American kill order, he implicitly excludes Putnam from the charge by dismissing him from the room before making his statement. The film thus not only lacks any concrete suggestion that Putnam was involved to any degree beyond assisting in a cover-up, it affirmatively suggests, through Horman, that Putnam played no role in the "kill order" he believes was issued on his son's life. Under these circumstances, a viewer could not reasonably infer that the movie charged Purdy with ordering or approving the order for Horman's murder. As this is the sole defamatory meaning alleged by plaintiff Frank Purdy, his complaint must be dismissed.

### III. *The Ambassador*

Defendants have moved for judgment on the pleadings on the same ground with respect to Nathaniel Davis' claim. Nathaniel Davis is allegedly depicted as "The Ambassador" in the film; like Consul Putnam, the Ambassador is not favorably portrayed. He is depicted as callous and indifferent to the needs and concerns of the Hormans. In one scene, having called a meeting with the Hormans, he seems to have forgotten about Charles Horman, and is startled by the Hormans' nervous questions upon entering the room concerning "what happened," and whether the Ambassador had "[found] him." The Ambassador, appearing confused, says "What? Oh, no, not that at all. I'm sorry," and proceeds to lecture Ed Horman on his mistaken conception regarding the existence of an "American police assistance program" in Chile,

informing him coldly that "nothing of that sort exists in this country." *Id.* at 104. When Ed Horman later turns the conversation to the loss of his son and his desire to get him back "in any condition," the Ambassador, pictured staring out the window with his face turned from Mr. Horman, appears not even to be listening. *Id.* at 106. The portrayal of the Ambassador as a cold and callous man is again suggested at the end of the film, in a scene in which he appears more concerned with the preservation of American interests and "a way of life" than with the preservation of American citizens. *Id.* at 160–61.

The filmmakers also suggest that the Ambassador is a liar. After the film has presented strong accusation of an extensive American military involvement in the coup, the Ambassador is pictured insisting to Ed Horman that "we're not involved" and that "our position has been completely neutral." *Id.* at 159. The suggestion that the Ambassador is lying is reinforced by Horman's angry but credible response: "That is a bald-faced lie, sir! How can you say a thing like that when you have Army Colonels, you have Naval engineers, . . . they're all over Vina del Mar!" The Ambassador lamely responds that Mr. Horman is "obvious[ly] . . . harboring some misconception regarding our role here." *Id.* at 160.

There is also a suggestion in the film that the Ambassador knows about Horman's death and is covering-up the fact of his death from the Hormans. He participates in an effort, which is an obvious charade, to persuade the Hormans that Charles is alive and well in the North. Shortly after Ed Horman learns from the Ford Foundation employee that his son was executed by the Military in the stadium, the Ambassador, unaware of Mr. Horman's new-found information, introduces him to a Mr. Samuel Cross. The Ambassador explains that "Mr. Cross is a journalist with good access to Left-wing circles down here . . . and he's dug up some interesting information about your son." *Id.* at 157. Mr. Cross explains, "I believe that your son's alive and well Mr. Horman. Captain Tower asked me to make inquiries about Charles'

whereabouts. I spoke with a guy who's currently helping political refugees escape. He told me his organization had secured credentials for three Americans to leave Santiago. One of them was your son." Mr. Horman asks, "Where is he?" "He is in the North," Cross responds, "he should be out of the country . . . sometime next week." When Horman asks, "Can I contact him?", Cross stumbles "H'h, no I'm afraid you can't. But I'll lay odds he's home in New York before you are." Horman angrily yells to the Ambassador, "Will you please get him out of here!" *Id.* At this juncture of the film, Cross' statement is so inherently implausible that a reasonable viewer could infer that the Ambassador, who stood behind Cross' story, knew that Cross' story was false, but nevertheless deliberately participated in the lie. A reasonable inference from this scene, in the context of the film as a whole, is that the Ambassador was aware of the truth—that Charles was dead—but that he was actively engaged in an effort to hide or cover-up this truth.

There is, however, no suggestion or statement in the film which could reasonably lead to an inference that the Ambassador "ordered or approved the order for the murder of Horman." Although Ed Horman includes the Ambassador in his charge of American complicity, this accusation is insufficient, standing alone, to give rise to an inference that the Ambassador was, in fact, responsible for issuing or approving a kill order.

Tower is the man with the Milgroup affiliation and with the connections to the Junta. There is no suggestion in the film that the Ambassador is personally friendly with or connected in any way to the Chilean Military. He, unlike Tower, is not depicted as someone in a position to issue a kill order to the Chilean Military. There is, moreover, no suggestion in the film that the Ambassador had ever met or even heard of Charles Horman before his disappearance, or that the Ambassador was in a position to learn of Horman's growing knowledge of the American involvement in the coup. Horman's death followed shortly

on the heels of his stay in Vina del Mar, and there is no indication that the Ambassador would have been consulted or immediately informed about Horman's "learning too much." Hence, to the extent the movie creates a motive for an American to issue a "kill order" to silence Horman, there is no reasonable basis for the inference that the Ambassador was in a position to develop such a motive. The film at most suggests that the Ambassador learned after the fact of the circumstances surrounding Horman's death and that he was not forthcoming with the Hormans, in order to protect "American interests" or preserve "a way of life." *Id.* at 160–61.

The question whether the movie stated or suggested that the plaintiffs ordered or approved the order for the murder of Horman is a closer one in the case of the Ambassador than in that of Putnam, inasmuch as the Ambassador is portrayed to be closer to Tower, personally and professionally, than Putnam is. But in the absence of any suggestion or statement that could reasonably lead to an inference that the Ambassador was personally responsible for ordering or approving the order for Horman's murder, that closeness or apparent conspiracy is suggestive only of a conspiracy to keep the Hormans in the dark regarding the circumstances of Horman's death.

Because the plaintiff Nathaniel Davis has alleged injury caused by the movie "Missing" only on the ground that it states or implies that he ordered or approved the order for Horman's murder, the defendants' motion for judgment on the pleadings must be granted. There is simply no basis in the film from which a reasonable inference can be drawn that plaintiff Nathaniel Davis issued or approved a kill order on Horman's life.

SO ORDERED.